UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **ELI BROWN,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **Case No. 1:13-cv-4020** |
| **v.** | ) |
| | ) **ORAL ARGUMENT REQUESTED** |
| **THE ROOSEVELT HOTEL** | ) |
| **CORPORATION N.V., et al.,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT

LeClairRyan, A Professional Corporation
885 Third Avenue, Sixteenth Floor
New York, New York 10022
(212) 634-5052 Phone
(212) 634-5063 Fax

Lorenger & Carnell PLC
651 South Washington Street
Alexandria, Virginia 22314
(703) 684-1808 – Phone
(703) 684-1805 – Fax

*Counsel for Defendants*

Of Counsel:
    Robert W. Hellner
    Michael J. Lorenger (*pro hac vice*)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ..........................................................................................1

    I.     SUMMARY OF KEY FACTS .............................................................................1

    II.    LEGAL STANDARD ...........................................................................................4

    III.   ARGUMENT .........................................................................................................5

           A.    The FLSA's "White Collar" Exemption For "Executive" Employees Is Well-Suited For Disposition On Summary Judgment. ...........................5

           B.    Plaintiff Routinely Carried Out Management Tasks In The Kitchen. .........7

           C.    These Management Tasks Were Plaintiff's "Primary Duty."....................10

           E.    Because It Cannot Be Disputed That Plaintiff Carried Out Important Management Functions, The Amount Of Time Plaintiff Spent ooking Is Not Material To Determination Of Plaintiff's 'Primary Duty'..............17

           F.    Plaintiff's Suggestions And Recommendations As To The Hiring, Firing, Advancement, Promotion Or Any Other Change Of Status Of Other Employees Were Given Particular Weight.....................................20

           G.    Plaintiff's State Law Claims Are Controlled By His Federal Claim Under The Fair Labor Standards Act And Should Also Be Dismissed.....22

    CONCLUSION....................................................................................................................23

i

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby. Inc.,*
  477 U.S. 242 (1986) .................................................................................................... 4, 5

*Beauchamp v. Flex-N-Gate LLC,*
  357 F.Supp.2d 1010 (E.D. Mich. 2005) ........................................................................ 9

*Buechler v. Davco Restaurants, Inc.,*
  2009 WL 3833999 (D.Md., Nov. 16, 2009) ........................................................ 18, 19, 21

*Celotex v. Catrett,*
  477 U.S. 317, 323 (1986) ............................................................................................. 4

*Clarke v. JPMorgan Chase Bank NA,*
  2010 WL 1379778 (S.D.N.Y., March 26, 2010) ....................................................... 6, 22

*DeSilva v. North Shore-Long Island Jewish Health Sys.,*
  770 F.Supp.2d 497 (E.D.N.Y. 2011) ........................................................................... 22

*Donovan v. Burger King Corp.,*
  675 F.2d 516 (2nd Cir. 1982) ............................................................................ 15, 18, 19

*Gellhaus v. Wal-Mart Stores, Inc.,*
  769 F.Supp.2d 1071 (E.D.Tex. 2011) ..................................................................... 21, 22

*Golden Pac. Bancorp v. FDIC,*
  273 F.3d 509 (2nd Cir. 2001) ....................................................................................... 23

*Golden v. Merrill Lynch & Co.,*
  2007 WL 4299443 (S.D.N.Y. Dec. 6, 2007) .............................................................. 6, 14

*Icicle Seafoods, Inc. v. Worthington,*
  475 U.S. 709 (1986) ..................................................................................................... 6

*Kaye v. Grossman,*
  202 F.3d 611 (2nd Cir. 2000) ....................................................................................... 23

*King v. Stevenson Beer Distrib. Co.,*
  2014 WL 1315655 (S.D. Tex. Mar. 27, 2014) .............................................................. 21

*Langley v. Gymboree Operations, Inc.,*
  530 F. Supp. 2d 1297 (S.D. Fla. 2008) ........................................................................ 14

*Lightfoot v. Union Carbide Corp.,*
  110 F.3d 898, 907 (2nd Cir. 1997) ............................................................................... 5

*Longo v. Shore & Reich, Ltd.*,
   25 F.3d 94 (2nd Cir. 1994) ......................................................................... 23

*Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574, 587 (1986) ......................................................................... 4, 5

*Moore v. Tractor Supply Co.*,
   352 F. Supp. 2d 1268 (S.D. Fla. 2004), *aff'd*, 140 F. App'x 168 (11th Cir. 2005) ................... 20

*Rainey v. McWane, Inc.*,
   552 F. Supp. 2d 626 (E.D. Tex. 2008) *aff'd*, 314 F. App'x 693 (5th Cir. 2009) ................. 11, 14

*Ramos v. Baldor Specialty Foods, Inc.*,
   2011 WL 2565330 (S.D.N.Y. June 16, 2011) *aff'd*, 687 F.3d 554 (2nd Cir. 2012)............. 21, 22

*Scherer v. Compass Group USA, Inc.*,
   340 F.Supp.2d 942 (W.D. Wis. 2004) ........................................... 9, 11, 18, 20, 21

*Scott v. SSP America, Inc.*,
   2011 WL 1204406 (E.D.N.Y. March 29, 2011) ........................................... 6, 19, 21

*Scotto v. Almenas*,
   143 F.3d 105, 114 (2nd Cir. 1998) ............................................................... 4

*Thomas v. Speedway SuperAmerica LLC*,
   506 F.3d 496 (6th Cir. 2007) ...................................................................... 11

**Statutes**

29 C.F.R. § 541.100(a) .............................................................................. 6, 7

29 C.F.R. § 541.100(a)(4) ............................................................................ 20

29 C.F.R. § 541.102 .................................................................................... 7

29 C.F.R. § 541.103 .................................................................................... 7

29 C.F.R. § 541.700 ............................................................................... passim

29 U.S.C. § 207(a)(1) .................................................................................. 5

29 U.S.C. § 213(a)(1) .................................................................................. 6

29 U.S.C. § 213 ........................................................................................ 22

Fair Labor Standards Act, 29 U.S.C. § 201 ............................................................. 1, 5

New York State Labor Law Arts. 6 and 19, §§ 190, 650 ................................................................. 5

**Rules**

Fed. R. Civ. P. 56(c) ........................................................................................................ 4

Fed. R. Civ. P. 56(e) ........................................................................................................ 4

**PRELIMINARY STATEMENT**

Defendants, Interstate Hotels, LLC and Interstate Hotels & Resorts, Inc. (collectively, "Interstate"), along with The Roosevelt Hotel Corporation, NV ("RHC"), respectfully submit this Memorandum of Law in Support of their Motion for Partial Summary Judgment.[1]  Specifically, Defendants are seeking entry of summary judgment on Counts I, II, III and IV of the Amended Complaint.  In these counts (the "Wage Claims"), Plaintiff, a Sous Chef at The Roosevelt Hotel (the "Hotel"), alleges that he is entitled to overtime pay because he is a "non-exempt" employee under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, and analogous state law.  However, the undisputed facts show that Plaintiff was an exempt "management" employee and, therefore, was not entitled to overtime compensation under any of the theories advanced.

## I.   SUMMARY OF KEY FACTS[2]

Plaintiff began his employment at the Hotel – a highly-rated and well-reviewed luxury hotel in Midtown near Grand Central Station – on October 21, 2008, when he was hired as a Banquet Sous Chef.  Undisp. Fact ¶ 1.  He continued in this role until April 2013, when he began a lengthy period of leave as a result of a medical disability.  Plaintiff's disability is now reported to be permanent, and thus although he remains employed "on the books," he has not been actively working since April 2013.

Throughout his approximately four years of active employment, Plaintiff's position resided organizationally in the Hotel's Kitchen Department.  The Kitchen is run by the Executive

---

[1]      Plaintiff is employed by Interstate Hoteis, LLC, which is a wholly owned subsidiary of Interstate Hotels & Resorts, Inc.  Interstate is the management company that operates The Roosevelt Hotel.  The Roosevelt Hotel Corporation NV is an entity affiliated with the Hotel's owners but is not and has never been Plaintiff's employer. For ease of reference, references to "Defendants" will typically refer to the Interstate entities, though The Roosevelt Hotel Corporation NV is seeking partial summary judgment as well.  By submitting this motion, The Roosevelt Hotel Corporation is not waiving any rights or defenses it has to Plaintiff's allegation that it was his employer.

[2]      The factual recitations in this section are drawn from Defendants' Rule 56.1 Statement, filed contemporaneously herewith.  Where facts are pertinent to the legal arguments presented, Defendants cite to specific paragraphs of that statement with the citation "Undisp. Fact ¶__."  Citations to individual Exhibits are denoted as "Ex. __."

1

Chef, who is denoted the "Department Head," and his two assistants, the Sous Chefs, of which Plaintiff was one before the onset of his disability.  Undisp. Facts ¶¶ 5-8.  At any given time during Plaintiff's employment, five to twelve Cooks (out of a total of approximately twenty that were regularly on staff) were on duty in the Kitchen, assigned to one or more food stations depending on whether they were preparing hot foods or cold foods, cooking for the cafeteria, or doing prep work.  Undisp. Facts ¶¶ 11, 12.  The Cooks were responsible for preparing food for several different Hotel "outlets," including the principal Hotel restaurant, a sidewalk-side restaurant/bar, a rooftop bar, and room service.

Although Plaintiff and his two fellow managers spent time cooking, their primary roles were directing the Cooks' work in the Kitchen.  Among other things, Plaintiff called Cooks together for pre-shift meetings; gave Cooks instructions on such things as cooking, plating, replenishing buffets, and other aspects of the Kitchen operation; inspected the Cooks' work areas and their adherence to safety protocols; instructed Cooks to remake food that was not up to the Hotel's quality standards; and called Cooks into work when business levels required.  Undisp. Fact ¶¶ 40-42.

Additionally, in the course of running the Kitchen, Plaintiff regularly carried out virtually all traditional "management" functions.  For example, on numerous occasions Plaintiff engaged the Hotel's disciplinary process to administer discipline to his subordinate employees for such things as refusing to follow his instructions, violating health standards, tardiness, and failure to report absences.  Undisp. Fact ¶ 13.  He also completed and approved the Kitchen payroll, signed "extra pay" authorizations for subordinate employees, completed attendance exception logs, and signed off on electronic audit reports – all functions integral to accurate completion of the payroll.  Undisp. Facts ¶¶ 33-36.  Plaintiff also wrote performance reviews, signed off on

employees' requests to be paid for their unused leave, and signed layoff letters over the "Manager" title notifying subordinate employees of layoffs.  Undisp. Facts ¶¶ 20-24, 50-55.  He was also responsible for the Kitchen's compliance with health code regulations, and he routinely filled out and signed mandatory Kitchen Department Self-Evaluations forms to ensure compliance with health code regulations.  Undisp. Facts ¶¶ 26-32.  As part of this important function, Plaintiff also trained the Cooks on safety and sanitation standards, and he administered and graded written tests, denoting who passed and who failed.  Undisp. Fact ¶ 46.

These sorts of tasks were regularly carried out by all three Kitchen managers – the Executive Chef and the two Sous Chefs – but not by the Cooks themselves, who performed none of these functions.  Undisp. Facts ¶¶ 19, 25, 30, 31, 38.  In fact, the roles of the Executive Chef and two Sous Chefs were dramatically different from those of the Cooks.  The managers were provided an office, email accounts, and similar things to accomplish their management tasks and complete required paperwork.  The Cooks had no offices and, in fact, were not even provided Company email addresses.  Significantly, all of the Cooks were members of the local Union; whereas Plaintiff and his two fellow managers were prohibited from holding Union membership because of their management roles.  Undisp. Facts ¶¶ 73-77.

That Plaintiff's role was a management role has never been in doubt.  The position of Banquet Sous Chef is described as a management position with extensive management duties in both the position's initial Job Requisition and Job Description.  Undisp. Facts ¶¶ 3, 60.  For his part, Plaintiff, who previously had worked in management at the Gramercy Park Hotel and certainly was not intending to move out of management, understood at time he was hired that his position was a management position.  Undisp. Fact ¶ 2.  Throughout his employment, Plaintiff embraced this role, repeatedly referring to himself as a "manager" and touting his leadership in

his many email communications.  Undisp. Fact ¶ 78.  In his own resume, which he wrote in 2012, Plaintiff states that during his tenure at the Hotel:  he managed and directed the Kitchen employees; he was responsible for "price structuring," "cost containment" and budgeting; he handled "quality control" and inspected and selected incoming foods; he assigned specific duties to cooks and set daily and weekly job assignments and work schedules; and he performed all related managerial duties.  Undisp. Fact ¶ 79.

Because the undisputed facts show that Plaintiff's management functions were integral to his primary role in the Kitchen, he was an exempt employee as a matter of law and was not entitled to overtime pay.  Accordingly, for the reasons set out below and on the basis of the undisputed facts set forth in Defendants' Rule 56.1 Statement, Defendants should be granted summary judgment on all of Plaintiff's Wage Claims.

## II.   <u>LEGAL STANDARD</u>

A party is entitled to summary judgment when there is "no genuine issue as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby. Inc.*, 477 U.S. 242, 247–48 (1986).  On a motion for summary judgment, the moving party has the initial burden of demonstrating the absence of a disputed issue of material fact.  *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the nonmoving party must present "specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Although the Court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, *see Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation."  *Scotto v. Almenas*, 143 F.3d 105, 114 (2nd Cir. 1998).

Not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment." *Anderson*, 477 U.S. at 248. To withstand a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. Instead, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmoving party. Summary judgment is designed to flush out those cases that are predestined to result in directed verdict. *Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 907 (2nd Cir. 1997).

## III.   <u>ARGUMENT</u>

In his Amended Complaint, Plaintiff's Wage Claims are advanced under four separate theories of recovery. In Count I, Plaintiff alleges that Interstate's failure to pay him overtime pay for all hours worked in excess of 40 in a workweek was a violation of the federal Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq*. ("FLSA"). Count II advances the same claim under New York State Labor Law Arts. 6 and 19, §§ 190, 650, *et seq*. ("NYLL"). Plaintiff's third and fourth causes of action arise under the common law – Count III alleging that Interstate's failure to pay Plaintiff overtime amounted to unjust enrichment, entitling Plaintiff to the same "overtime" damages he is seeking in Counts I and II; and Count IV alleging a claim of quantum meruit recovery.[3]

### A.   <u>The FLSA's "White Collar" Exemption For "Executive" Employees Is Well-Suited For Disposition On Summary Judgment.</u>

Generally speaking, the FLSA requires employers to pay employees premium pay, which is calculated as one-and-one-half times an employee's regular hourly rate of pay, for every hour the employee works in a workweek in excess of forty. 29 U.S.C. § 207(a)(1). However, there

---

[3]      Counts II, III and IV are addressed at the end of this brief.

are numerous and varied exceptions to this mandate, among them the so-called "White Collar Exemptions," which exempt from the overtime pay provisions "any employee employed in a bona fide executive, administrative, or professional capacity . . . , or in the capacity of outside salesman." 29 U.S.C. § 213(a)(1). To qualify as an exempt "executive" under the FLSA, an employee must (i) be compensated on a salary basis at a rate of not less than $455 per week; (ii) have as his "primary duty" the management of the enterprise or of a customarily recognized department or subdivision thereof; (iii) customarily and regularly direct the work of two or more employees; and (iv) have the authority to hire or fire other employees or to provide suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees that are given particular weight. 29 C.F.R. § 541.100(a); *Scott v. SSP America, Inc.*, 2011 WL 1204406 *7 (E.D.N.Y. March 29, 2011).

The primary issue for resolution by the Court, then, is whether the "executive" exemption applies to Plaintiff.[4] "Whether an employee is exempt from FLSA overtime coverage is a mixed question of law and fact." *Clarke v. JPMorgan Chase Bank NA,* 2010 WL 1379778 *15 (S.D.N.Y., March 26, 2010), citing *Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714 (1986). "The question of how the [employee] spent [his] working time ... is a question of fact. The question whether [his] particular activities excluded [him] from the overtime benefits of the FLSA is a question of law." *Id.* (citations omitted). Thus, "[t]he ultimate question of a particular worker's exemption, based on factual findings as to [his] actual work activities, requires a conclusion of law." *Id.* (citations omitted). Under this standard, Plaintiff's status as an exempt "executive" is easily determinable as a matter of law. As Defendant's Rule 56.1 Statement

---

[4] "[I]n the Second Circuit, employers bear the burden of proof to establish an exemption only by a preponderance of the evidence." *Golden v. Merrill Lynch & Co.*, 2007 WL 4299443 *17 (S.D.N.Y. Dec. 6, 2007) (rejecting plaintiff's argument that defendant was required to satisfy a heightened burden to establish application of the exemption).

makes clear, Plaintiff's exempt, management-related duties and activities during his active employment were recorded in contemporaneous emails and official hotel records signed by him, and accordingly there can be no genuine <u>factual</u> dispute concerning Plaintiff's repeated execution of these important management functions during his tenure.   Therefore, there are no factual issues to resolve, and the Court may proceed directly to the legal question of applying the executive exemption to the known, undisputed facts, which show that Plaintiff's duties clearly satisfy all elements of the exemption.[5]

### B.   <u>Plaintiff Routinely Carried Out Management Tasks In The Kitchen.</u>

Plaintiff's management function cannot be the subject of a genuine dispute.   Under the FLSA:

> Generally, "management" includes, but is not limited to, activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

---

[5]     Regarding the factors set forth in 29 C.F.R. § 541.100(a), Plaintiff does not dispute that he was compensated on a salary basis at a rate of at least $455 per week.  In fact, he alleges it.  *See* Ex. 1, ¶¶ 60-64. Similarly, there can be no dispute that the Kitchen is a "customarily recognized department or subdivision" of the Hotel.  "The phrase 'a customarily recognized department or subdivision' is intended to distinguish between a mere collection of employees assigned from time to time to a specific job or series of jobs and a unit with permanent status and function.  A customarily recognized department or subdivision must have a permanent status and a continuing function."  29 C.F.R. § 541.103.  Here, the Kitchen is a permanent, ongoing organizational unit of the Hotel, with its own Department Head, its own  budget, and a dedicated team of employees, including Cooks and Stewards.  Undisp. Facts ¶¶ 8-10.  Finally, it cannot be disputed that more than two employees worked in the Kitchen at any given time.  Undisp. Facts ¶¶ 11, 12.

Plaintiff engaged in many of these and similar management activities on a regular basis during his tenure, as evidenced by Hotel records, Plaintiff's emails, and even his own testimony.

For example, the summary judgment record is replete with documents and emails showing Plaintiff's use of the Hotel's disciplinary and performance management process to discipline employees for poor performance, violations of policy, and perceived misconduct. *See generally* Undisp. Fact ¶ 13 (citing multiple and varied instances in which Plaintiff issued or participated in the issuance of discipline to lower level employees). More telling than the sheer number of these incidents, though, is the language Plaintiff used in administering discipline. In one case, for example, Plaintiff cited a subordinate employee's "insubordination" to Plaintiff as the reason for the discipline, a turn-of-phrase that clearly illustrates Plaintiff's exercise of managerial authority. *See* Ex. 19. In another case, Plaintiff threatened to send the employee home. *See* Ex. 23. The documents also show that Plaintiff was not required to secure permission from his superiors to carry out the disciplinary process. Instead, the records unequivocally reflect the actions of a manager who was vested with full authority to initiate the disciplinary process: Exhibit 21 shows that Plaintiff drafted disciplinary notices himself before sending them to the Human Resources Department for "help in enforcing" them; Exhibit 17 shows Plaintiff directing the HR Department to prepare a write-up for an employee; Exhibit 24 shows that Plaintiff issued a "verbal warning" to a subordinate and only informed the Executive Chef of the matter afterward.[6]

---

[6]     That Plaintiff's exercise of this managerial authority typically involved consultation with the Human Resources Department does not make his issuance of discipline any less a "management function." In this case, the unionized status of the Cooks made it prudent for the Hotel's HR Department to monitor the disciplinary process to ensure that managers followed the Collective Bargaining Agreement. Undisp. Facts ¶¶ 14, 15, 17; *see also* Ex. 27 at IHR-Email-045149 (L. Zoltowska informs Plaintiff that with regard to his issuance of discipline: "I am here to assist and support."). This HR oversight is essential, because disciplinary write-ups of the kind initiated by Plaintiff play an important role in the Hotel's effort to manage the performance of employees who are protected by the union in so many aspects of their employment. Undisp. Fact ¶ 18. Accordingly, it is clear that Plaintiff exercised the full scope of management authority with regard to discipline, notwithstanding the fact that his exercise of this authority

Plaintiff carried out a multitude of management functions in addition to the issuance of discipline, of course:

- Plaintiff wrote performance reviews for his subordinates because the Executive Chef valued his judgment concerning the Cooks' performance.  Undisp. Facts ¶¶ 20-23.

- Plaintiff reviewed and signed the Kitchen payroll on a regular basis, which required him to review and sign Time Card Reports, correct errant time punches in the internal database and authorize changes, review and approve Audit Trail Reports, approve Attendance Exception Logs for the week, and authorize additional pay when Cooks performed additional tasks.  Undisp. Facts ¶¶ 33-36.

- Plaintiff also signed off on Cooks' requests for payout of their vacation leave. Undisp. Fact ¶ 37.

- Plaintiff had important responsibilities for monitoring and testing the Kitchen's compliance with health code regulations related to food sanitation and culinary safety, which tasks included auditing the Kitchen's compliance with food safety rules, keeping records required by state law regarding food safety, and completing Self-Evaluation Forms.  Undisp. Facts ¶¶ 26-29.

- Plaintiff trained the Cooks on safety, sanitation and cleanliness regulations and policies, going so far as to administer and grade written tests.  Undisp. Fact ¶ 46.

- Plaintiff had responsibility, along with his co-managers in the Kitchen, for controlling costs and managing the Kitchen budget.  Undisp. Fact ¶ 50.

- Plaintiff attended BEO meetings to discuss Banquet Event Orders with other managers, a task that was exclusively reserved for Kitchen management.  Undisp. Fact ¶ 51.

- Plaintiff's duties included controlling costs and managing the budget.  Undisp. Fact ¶ 50.

The Cooks performed none of these functions, as they were reserved for Hotel managers.

Undisp. Facts ¶¶ 19, 25, 30, 31, 38.

---

was controlled in some respects by the Collective Bargaining Agreement.  *See, e.g., Beauchamp v. Flex-N-Gate LLC*, 357 F.Supp.2d 1010, 1017, 1019 (E.D. Mich. 2005) (finding plaintiff to be an executive, despite close limits on discretionary authority, reasoning that restrictions imposed by collective bargaining agreement "do not alter the essential 'managerial' nature of the duties actually performed by Plaintiff in this position"); *Scherer v. Compass Grp. USA, Inc.*, 340 F. Supp. 2d 942, 953-54 (W.D. Wis. 2004) (granting summary judgment to employer despite the fact that plaintiff "was not empowered to promote, discipline or fire employees because such action was regulated by their collective bargaining unit and therefore, handled by those with more expertise in labor relations.").

In addition to these activities, Plaintiff directed the work of the Cooks while he was working.  Plaintiff admitted that he had authority to, and did, call the Cooks together for meetings to discuss business issues; that he monitored their plating of food and presentation; that he had authority to instruct them to remake food if it was not up to the Hotel's quality standards; that he was responsible for inspecting their workstations for cleanliness; that he enforced compliance with policies and procedures, and similar things.  Undisp. Facts ¶¶ 40-42.  His contemporaneous emails show him engaging in similar activities such as:  assigning work to subordinates, attempting to resolve conflicts among Kitchen staff; making and adjusting Cooks' schedules; making assignment lists for the Stewards; assigning Cooks to specific tasks or stations, calling in Cooks to work when business levels so required, and similar things.  Undisp. Fact ¶ 48.  The Cooks, for their part, were well aware that Plaintiff was in charge.  Undisp. Fact ¶ 44.

Accordingly, there can be no genuine dispute of fact that Plaintiff performed critical management functions.

**C.    These Management Tasks Were Plaintiff's "Primary Duty."**

To qualify for the executive exemption, the management tasks that Plaintiff performed must have been his "primary duty."  In this context, the term "primary duty" means "the principal, main, major or most important duty that the employee performs" based on "the character of the employee's job as a whole."  29 C.F.R. § 541.700.  Courts consider a variety of factors in determining whether an employee's exempt or non-exempt work constitutes his "primary duty," including "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the

wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* In this case, the undisputed facts show that Plaintiff's management tasks were his primary duties.

### 1.   Plaintiff's   Management   Duties   Were   Widely   Regarded to be his Most Important Duties.

In assessing the relative importance of an employee's exempt and non-exempt duties, courts recognize that the opinion of the employer as to which duties are most essential to the proper functioning of the department is of paramount importance. *See, e.g., Thomas v. Speedway SuperAmerica LLC,* 506 F.3d 496, 505 (6th Cir. 2007) (courts must compare the importance of the plaintiff's managerial duties with the importance of her non-managerial duties, "keeping in mind the end goal of achieving the overall success of the company."); *Rainey v. McWane, Inc.,* 552 F. Supp. 2d 626, 629 (E.D. Tex. 2008) *aff'd,* 314 F. App'x 693 (5th Cir. 2009) (To determine an employee's "primary duty", courts consider "what [the employee does] that is of principal value *to the employer*, not the collateral tasks that [he] may also perform, even if [the tasks] consume more than half of [his] time.") (emphasis added); *Scherer v. Compass Group USA, Inc.,* 340 F.Supp.2d at 954   (summary judgment granted where, among other things, both the employer and subordinates "regarded plaintiff as a manager").  This stands to reason because, after all, the employer is ultimately responsible for the manner in which the business is run.

In this case, it clear that Interstate considered Plaintiff's management duties to be far more important to the proper functioning of the Kitchen than any non-exempt work he might perform.  First, the position of Banquet Sous Chef was established as, and had always been determined to be, a "management" position.  Indeed, the Hotel's Job Requisition for the position stated, among other things, that the successful candidate would be required to "coordinate, plan and supervise the production, plating and presentation of the food at all Banquet events in a cost effective manner to meet/exceed guest expectations and attract future business."  Undisp. Fact

¶3.   The Requisition went on to state that the individual hired "will supervise the daily production of food for all catered events; control food and labor costs,  . . . ensure that the appropriate quantity of food is prepared and safety standards and regulations are followed to provide top quality food."   Undisp. Fact ¶ 3.   The formal Job Description for the position includes a similar description of the managerial nature of the position.  Undisp. Fact ¶ 60.  As noted above, Plaintiff carried out these very duties throughout his employment.

Second, a Performance Improvement Plan ("PIP") given to Plaintiff in 2010 – more than two years after he started and nearly halfway through his tenure – shows that he was graded by upper management <u>exclusively</u> on his performance of management functions and not on his skill as a cook.  Undisp. Facts ¶¶ 62, 65-67.  In the PIP, Plaintiff's manager noted that Plaintiff was expected to make significant improvement in the performance of his "key performance objectives," including:  (i) ensuring consistency in quality and pricing of food items; (ii) setting cost for wedding plates; (iii) ensuring that the Kitchen staff complies with health department standards; (iv) inspecting the buffet line daily to ensure consistency and quality; (v) reducing and resolving conflicts among employees reporting to him; (vi) using his "managerial skills to lead by example"; and (vii) executing effectively the essential duties listed on his job description, which included supervising the daily production of food, controlling food and labor costs, ensuring prepared meals met quality standards, supervising employees, recommending discipline, planning and coordinating banquet functions, and similar managerial tasks.  Undisp. Fact ¶ 65.

That the PIP focuses exclusively on the very same managerial functions outlined in the original Job Requisition and the Job Description (all of which Plaintiff performed regularly, as his emails and documents cited above make clear), demonstrates conclusively that these

management duties, and not Plaintiff's cooking duties, were "the principal, main, major or most important duty that the employee performs" based on "the character of the employee's job as a whole." 29 C.F.R. § 541.700. Significant, too, is the fact that the PIP specifies that Plaintiff remained <u>individually</u> <u>responsible</u> for the <u>Kitchen's</u> <u>performance</u> in respect to these goals. For example, Plaintiff is not merely instructed to create guidelines and checklists for breakfast, but is instead told that he is responsible for improving the Breakfast Quality of Food Guest Satisfaction Survey Score to 78%. *See* Ex. 56. Only a manager can take the steps necessary to achieve such a goal. Finally, the fact that Plaintiff was not fired after he received the PIP shows that he satisfactorily executed the required management functions outline in the PIP after receiving it.[7] In fact, Plaintiff's manager testified that Plaintiff achieved or attempted to achieve most of the goals listed, Undisp. Fact ¶ 67, and Plaintiff testified that when he was challenged to prove that he could satisfy the PIP, he did so "to the best of my ability." Undisp. Fact ¶ 68.

Third, in the performance evaluation Plaintiff received in 2011, Plaintiff's manager noted, among other things:

- Needs to have daily stand-ups on his shift in order to improve communication with his associates.
- Eli understands the forecast and controls food cost.
- He develops plan for the kitchen and on most cases he follows through.
- He need to learn how to better manage in a union environment and get the most out of our staff.
- Needs to build better relationships not only with his staff but with his fellow managers as well.

---

[7] The PIP states: "[I]f at anytime [sic] during these next 60 days you fail to correct the deficiencies listed above, or fail to demonstrate marked improvement in your overall performance, or if there is a need to address additional concerns with your performance or leadership, it could result in further disciplinary action up to and including termination. Ex. 56 (IHR-Email-019191).

Undisp. Fact ¶ 63.[8]

The significance of these documents cannot be overstated. In *Langley v. Gymboree Operations, Inc.*, 530 F. Supp. 2d 1297 (S.D. Fla. 2008), for example, the Court found that Corrective Action Notices delivered to the plaintiff "reveal the importance [the company] placed on her managerial tasks" and supported the employee's classification as an exempt employee. Much like the Performance Improvement Plan issued to Plaintiff in this case, the *Langley* plaintiff was given Corrective Action Notices that included statements that Plaintiff must achieve specific company identified goals and must "promote a positive work place," "manage employee relation issues in a timely manner in partnership with DM," "train/role play daily on selling outfits w/accessories," and "ensure compliance in stock room neat/organized at all times." *Langley,* 530 F.Supp.2d at 1302. According to the Court, the company's emphasis on these management tasks showed that the plaintiff's management duties, and not her non-management tasks, were of primary importance to the successful operation of the business. *Id.*; *see also Golden*, 2007 WL 4299443, at *13 (finding plaintiff to be a supervisor, in part on the basis of her performance evaluations, which showed "that she was evaluated on the basis of her supervisory skills); *Rainey,* 552 F. Supp. 2d at 630-31 ("[T]he factors an employer uses to evaluate an employee is evidence of an employee's principal value to the employer and therefore whether the employee is managerial."). Here, it is undisputed that Plaintiff's performance was evaluated exclusively on his performance of management functions. Therefore, there can be no dispute that these management functions were the most important functions to the operation of the business. Undisp. Fact ¶ 64.

_____

[8]     There is but a single comment on either of these documents regarding Plaintiff's cooking skills, and it notes only that "Eli has great cooking skills and many great new menu ideas which he shows off during our VIP parties." Ex. 55.

The relative importance of Plaintiff's management duties as compared to his alleged cooking responsibilities is also made clear by the fact that the Kitchen managers were provided an office, email accounts, usernames and passwords, IT system access, and similar things to accomplish their management tasks and complete required paperwork.   Plaintiff used these facilities on a regular basis and referred to the office as "my office" in email communications. The Cooks – whose primary duty is, of course, cooking – have no office, no computer access, and no paperwork to complete.   Undisp. Facts ¶¶ 73-76.   Similarly, the unrefuted testimony of Plaintiff's two managers shows that Plaintiff's efforts in managing the Kitchen were critical to the proper functioning of the department.   Undisp. Fact ¶ 45.

2. **Plaintiff Performed Many of His Activities Without Constant, Direct Supervision.**

Although Plaintiff reported to the Executive Chef, much of his job was carried out without direct supervision.  Although there were times when the shifts of the Executive Chef and the two Sous Chefs overlapped, there were many times when Plaintiff was the only manager on duty and thus was solely responsible for the Kitchen's operation.   Undisp. Facts ¶¶ 70, 71. Plaintiff acknowledged there were times when he was working and neither the Executive Chef or the other Sous Chef was on duty.  *Id.*   That Plaintiff called his boss to seek advice from time to time or in difficult circumstances does not mean that he did not perform many of his management activities without supervision.  *Donovan v. Burger King Corp.*, 675 F.2d 516, 522 (2nd Cir. 1982) (that supervisor was available to give advice did not mean he was closely supervising the plaintiffs); *Scherer,* 340 F. Supp. 2d at 954 ("Seeking out guidance is different from being subject to close supervision. In a sense, deciding when to ask for advice or directions is itself an exercise of discretion.").

3.    **Plaintiff's   Salary   Was   Significantly   Higher   Than the Wages of the Cooks He Supervised.**

Plaintiff's salary, like that of the other Sous Chef, was significantly greater than the wages earned by the Cooks.  In fact, Plaintiff's annual compensation was approximately $20,000 more than the average annual compensation of the Cooks.  Undisp. Fact ¶ 82.  This fact also is indicative of Plaintiff's management role.  29 C.F.R. § 541.700.

4.    **Plaintiff Considered Himself A Manager.**

Finally, throughout his employment, Plaintiff repeatedly referred to himself has a "manager" and touted his management responsibilities.  For example, Plaintiff wrote such things as:

- "Whom is in charge once I leave?"  Ex. 60 (IHR-Email-046496);
- "I need a Micros Card so I can void checks . . . in the morning when there are no other managers."  Ex. 60 (IHR-Email-040877);
- "I had assigned work to the overnight stewards."  Ex. 60 (IHR-02104);
- "I am asking you to . . . make sure that Miguel understands that I am a manager and that the scope of my work is . . . making sure standards are met."   Ex. 60 (IHR-Email-037809);
- "When we got to the kitchen I had exchanged words with Mr. Tony; I had explained to him that I am doing my job as a manager."  Ex. 60 (IHR-012088 – included with file related to Security Incident Report related to incident of 7/13/2009) (Redact Information Re; T. Hernandez identity).
- "All I am doing is my duty as a manager."  Ex. 60 (IHR-Email-060328)

Undisp. Fact ¶ 78.

Plaintiff wrote similar descriptions of his job functions in his resume, which he authored 2012 and distributed to potential employers thereafter.  In that document, he represented that during his employment at the Hotel his duties were entirely managerial in nature.  Among other things, Plaintiff wrote that:  He managed and directed the Kitchen employees; he was responsible for "price structuring," "cost containment" and budgeting; he handled "quality control" and

inspected and selected incoming foods; he assigned specific duties to cooks and set daily and weekly job assignments and work schedules; and he performed all related managerial duties. Undisp. Fact ¶ 79.

Additionally, unhappy with the score he received on his evaluation in 2012, Plaintiff responded to the review noting, among other things: that he was "leading by example"; that he should be given credit for all the work he does handling training, ordering food, payroll, scheduling, costing and inventory; that he created recipes books and plating guides for the cooks to follow; that he convened "stand-up" meetings every day and covered training topics, advised cooks of the Hotel's business levels and set expectations. Undisp. Fact ¶ 80.

Although Plaintiff may try to distance himself from his own words, it is significant that Plaintiff's resume, his response to his performance review, the 2011 Performance Evaluation, the 2010 Performance Improvement Plan, the Declarations of Plaintiff's subordinates, and Plaintiff's contemporaneous emails all reflect Plaintiff's performance of exactly the same managerial duties outlined the original Job Requisition and Plaintiff's Job Description. For these reasons, there is no genuine dispute that Plaintiff carried out a managerial role in the Kitchen and that this role was his primary duty.

     **E.**     **<u>Because It Cannot Be Disputed That Plaintiff Carried Out Important Management Functions, The Amount Of Time Plaintiff Spent Cooking Is Not Material To Determination Of Plaintiff's 'Primary Duty'.</u>**

Plaintiff's primary argument in support of his Wage Claims is that he spent the majority of his time preparing food, cooking, and cleaning. However, these allegations (though disputed) are not material to application of the exemption in these circumstances. As noted above, the federal courts are uniform in holding that whether management is an employee's "primary duty" turns not on the amount of time spent on exempt or non-exempt tasks, but on whether

management is the "principal, main, major or most important" function to the employer.  *See* 29 C.F.R. § 541.700; *Scott*, 2011 WL 1204406 at *7; *see also Buechler v. Davco Restaurants, Inc.*, 2009 WL 3833999 (D.Md., Nov. 16, 2009); *Scherer*, 340 F.Supp.2d at 952-53.

While the amount of time an employee spends on exempt and non-exempt duties is one factor in the "primary duty" analysis, it is only one of several, and it is not a particularly useful criterion when the facts show that the employee's management functions are more important to the employer's operation of the business.  This irrefutable proposition was confirmed years ago in the seminal case of *Donovan v. Burger King Corp.*, 675 F.2d 516 (2nd Cir. 1982), wherein the Second Circuit, interpreting the pre-2004 FLSA regulations, held that "time alone ... is not the sole test" and that an employee may "nevertheless have management as his primary duty if the other pertinent factors support such a conclusion."  *Id.* at 521.  That the *Donovan* Court reached this conclusion under the pre-2004 FLSA regulations is significant, as the earlier regulations expressly spelled out as a "rule of thumb" the proposition "that 'primary duty' means that work which occupies over 50% of an employee's time."  *Donovan*, 675 F.2d at 521.  This "rule of thumb" applied regardless of whether the work that comprised more than fifty percent of employee's time was exempt or non-exempt work.  The Department of Labor intentionally removed this text from the regulations in 2004, replacing it with Section 541.700, which provides in pertinent part:

> The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee. Thus, employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

> Thus, for example, assistant managers in a retail establishment who perform exempt executive work such as supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such assistant managers are closely supervised and earn little more than the nonexempt employees, the assistant managers generally would not satisfy the primary duty requirement.

29 C.F.R. § 541.700(b) & (c).

Significantly, while this regulation states that an employee who spends more than fifty percent of his time performing exempt work will generally satisfy the "primary duty" requirement for the exemption, it specifically omits the inverse concept – that an employee who spends more than fifty percent of his time doing non-exempt work is presumptively non-exempt. As a result, in light of the regulation's focus on the importance of the management tasks to the employer, regardless of time spent, courts routinely hold managers to be exempt under the "executive" exemption if the management functions are those that are the most important or critical to the success of the employer, even when the majority of the manager's time is spent performing routine non-management duties.

In *Donovan*, for example, the Court found that the plaintiffs supervised other employees, scheduled employees, assigned work, oversaw production quality, trained employees, determined the quantity of food to be produced at any given time, and performed various recordkeeping, inventory and cash reconciliation duties. *Donovan*, 675 F.2d at 521. Thus, even though the employees spent the majority of their time performing non-exempt work, management was still their primary duty because it was a significant part of their job. *Id.* at 520-21. Similar analysis and conclusions were reached in *Scott*, 2011 WL 1204406 at *7 (summary judgment granted for employer despite employee's testimony that 90% of her time was spent on non-managerial duties); *Buechler*, 2009 WL 3833999 (summary judgment granted for employer

19

despite plaintiff's testimony that 75% of his time was spent on non-management tasks); *Scherer*, 340 F.Supp.2d at 952-53 (summary judgment granted for employer despite plaintiff's testimony that 75% of his time was spent cooking food); and *Moore v. Tractor Supply Co.*, 352 F. Supp. 2d 1268, 1273-75 (S.D. Fla. 2004), *aff'd*, 140 F. App'x 168 (11th Cir. 2005) (plaintiff was exempt executive despite testifying that 95% of his time was spent performing non-exempt tasks).

In short, when an employee is retained to perform a management role and the management functions are important to the success of the department, management is the employee's primary duty, regardless of time spent on related non-management tasks.

F.   **Plaintiff's Suggestions And Recommendations As To The Hiring, Firing, Advancement, Promotion Or Any Other Change Of Status Of Other Employees Were Given Particular Weight.**

The final factor considered in determining whether an employee is an exempt executive is whether he is an employee who has the authority to hire or fire other employees or whose "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."   29 C.F.R. § 541.100(a)(4).

In this case, no one at the Hotel had unrestrained ability to terminate employees who are members of the union.   Undisp. Facts ¶ 15.   However, it cannot be disputed that Plaintiff's recommendations as to changes of status of these employees were given particular weight.   In November 2012, Plaintiff advised the Executive Chef that business levels were low and they needed to lay off some of the Cooks.   The Executive Chef took Plaintiff's recommendation seriously and ultimately agreed with Plaintiff that layoffs were necessary.   The following month, the Hotel subjected five Cooks to reduced hours and layoffs. Undisp. Facts ¶ 55.

Moreover, Plaintiff's role in administering discipline and writing reviews demonstrates that his suggestions concerning his subordinates' employment are given "particular weight."

The Hotel's disciplinary and evaluation process – and the related records of the sort completed by Plaintiff – are an important part of the ongoing performance management of Hotel employees. Plaintiff admitted that the Executive Chef asked him to write reviews because he valued his input, and the Executive Chef confirmed that he relied on Plaintiff's judgment in carrying out t this task.  Undisp. Facts ¶¶ 23, 24.  Similarly, decisions concerning whether or not to discharge a particular employee are based in large part on the employee's documented performance history, including the history of write-ups and discipline of the sort initiated by Plaintiff throughout his employment.  Undisp. Facts ¶ 18.  *See Ramos v. Baldor Specialty Foods, Inc.*, 2011 WL 2565330 (S.D.N.Y. June 16, 2011) *aff'd*, 687 F.3d 554 (2nd Cir. 2012) (plaintiffs who participated in performance evaluations, reported underperforming employees to their bosses, and were authorized to issue warnings to employees, satisfied fourth prong of the "primary duty" analysis); *Scott*, 2011 WL 1204406 (Plaintiff's authority to recommend suspensions and to initiate disciplinary process against the unionized, hourly employees is sufficient to show that her recommendations and suggestions as to changes in employment status were given particular weight); *Gellhaus v. Wal-Mart Stores, Inc.,* 769 F.Supp.2d 1071, 1081-83 (E.D.Tex. 2011) (plaintiff's recommendations given particular weight because she  "was tasked with disciplining employees under her supervision by issuing written or verbal warnings . . . which could result in termination"); *Buechler,* 2009 WL 3833999 (plaintiff's recorded reprimands and praise were used in employment decisions); *Scherer*, 340 F.Supp.2d at 946-47 (plaintiff had no independent ability to discipline employees but could use informal "coaching and counseling" forms if he did not like the way an employee was performing); *King v. Stevenson Beer Distrib. Co.*, 2014 WL 1315655 (S.D. Tex. Mar. 27, 2014) (that plaintiff "occasionally requested that the operations manager facilitate discipline for underperforming employees" was sufficient to show that "his

recommendations about discipline, hiring, and firing or employees were given particular weight").

Accordingly, although the ultimate firing of union employees is controlled by the Collective Bargaining Agreement and therefore subject to review and approval of the Human Resources Department, Plaintiff's lack of ultimate authority on these issues does not make him any less a manager.  *See, e.g., Gellhaus,* 769 F.Supp.2d at 1081 (An employee's suggestions or recommendations may still have particular weight even if a higher manager's recommendation has more importance and even if the employee does not make the ultimate determination.").

### G.      Plaintiff's State Law Claims Are Controlled By His Federal Claim Under The Fair Labor Standards Act And Should Also Be Dismissed.

Plaintiff's claim for unpaid overtime under NYLL suffer the same fate as his FLSA claim, inasmuch the disposition of NYLL overtime claims is controlled by the disposition of the analogous FLSA claim.  *See Ramos,* 2011 WL 2565330 at *5 n.3 (holding that the Court's analysis of the FLSA exceptions applies equally to the plaintiff's claim under NYLL); *Clarke,* 2010 WL 1379778 at *15 n.7 (plaintiff's overtime claim under NYLL is subject to the same exceptions as those set forth in 29 U.S.C. § 213).  Accordingly, Plaintiff's NYLL claim fails for the reasons set forth above.

Plaintiff's equitable claims also require dismissal, for two reasons.  Principally, the claims are alleged to arise from exactly the same set of facts as Plaintiff's FLSA claim and to seek the same recovery – namely, unpaid overtime.  *See* Ex. 1, ¶¶ 146-160.  Accordingly, the equitable claims are preempted by the FLSA and may not proceed.  *See DeSilva v. North Shore-Long Island Jewish Health Sys.,* 770 F.Supp.2d 497, 530-32 (E.D.N.Y. 2011) (citing cases).

Even were they not preempted, the same facts that entitle Defendants to summary judgment on Plaintiff's FLSA claim require the entry of summary judgment on the equitable

claims as well.  To prevail on a claim of unjust enrichment under New York law, a plaintiff must establish that: (1) the defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances are such that equity and good conscience require restitution.  *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 519 (2nd Cir. 2001).  "The 'essence' of such a claim 'is that one party has received money or a benefit at the expense of another.'"  *Kaye v. Grossman*, 202 F.3d 611, 616 (2nd Cir. 2000).  Plaintiff also claims that he are entitled to quantum meruit recovery for the reasonable value of services performed during his employment.  To establish a claim for quantum meruit under New York law, a plaintiff must show: (1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services.  *Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 98 (2nd Cir. 1994).  Here, because Plaintiff was an exempt employee with important management functions, paid in compliance with the FLSA and NYLL, and paid an annual salary of almost $80,000 – significantly higher compensation than that earned by the Cooks he supervised – he cannot prove that Defendants were "unjustly enriched," that "good conscience" requires him to be provided additional compensation, or that he was paid less than the "reasonable value" of his services.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that their Motion for Partial Summary Judgment be granted.

Dated: New York, New York
     September 29, 2014

     s/RH1927_____
     Robert W. Hellner
     LeClairRyan, A Professional Corporation
     Robert.Hellner@leclairryan.com
     Michael J. Lorenger (*pro hac vice*)
     Lorenger & Carnell PLC
     mlorenger@lorengercarnell.com

     *Counsel for Defendants*